# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:08cv367

| | |
|---|---|
| HIGH VOLTAGE BEVERAGES, LLC,     ) | |
|                               ) | |
|         **Plaintiff,**        ) | |
|                               ) | |
| **Vs.**                            ) | **MEMORANDUM AND** |
|                               ) | **RECOMMENDATION** |
| THE COCA-COLA COMPANY,   ) | |
|                               ) | |
|         **Defendant and Counter**  ) | |
|         **Claimant,**        ) | |
|                               ) | |
| **Vs.**                            ) | |
|                               ) | |
| BRAND NAME MANAGEMENT, INC.;  ) | |
| and OWEN RYAN,             ) | |
|                               ) | |
|         **Counter Defendants.**  ) | |
| _____) | |

**THIS MATTER** is before the court upon the following motions:

(1)     The Coca-Cola Company's (hereinafter "TCCC") Motion for Partial Summary Judgment (#197); and

(2)     plaintiff/counterclaim-defendant High Voltage Beverages, LLC's (hereinafter "HVB"), counterclaim-defendants Brand Name Management, Inc.'s (hereinafter "BNM") and Owen Ryan's (hereinafter "Mr. Ryan") Motion for Partial Summary Judgment (#199).

-1-

Having carefully considered such motions, the memoranda filed in support, opposition, reply, supplementation, and reply to the supplementation, as well as the extensive exhibits, and having conducted a non-evidentiary hearing on such motions[1] on August 17, 2010, and having allowed the additional discovery requested, the court enters the following findings, conclusions, and recommendation that TCCC's Motion for Summary Judgment be granted in part and denied in part and that HVB's, BNM's, and Mr. Ryan's Motion for Summary Judgment be denied in part and granted in part.

## FINDINGS AND CONCLUSIONS

### I.   Background

#### A.   The Amended Complaint

In this action, HVB asserts claims against TCCC for trademark infringement in violation of the Lanham Trademark Act of 1946, 15 United States Code Section 1051 *et seq*. HVB contends that the defendant's use of the federally registered VAULT mark violates plaintiff's rights in its earlier federally registered mark VOLT. HVB contends that both its mark and the alleged infringing mark are used in the sale of either soft drinks or "electrolyte replacement" drinks, Amended Complaint

---

[1]      As to the HVB's, BNM's, and Mr. Ryan's Motion for Partial Summary Judgment, the court heard arguments, without objection, even though such motion was not noticed by the court for hearing.  Such parties' Motion for Hearing, which had not ripened by the time of the hearing, has been denied as moot by separate Order.  No further hearing is necessary as the issues have been thoroughly briefed by respective counsel.

Case 3:08-cv-00367-GCM -DLH   Document 240   Filed 12/16/10   Page 2 of 47

(hereinafter "AC") (#35), at ¶ 1, and that such products are marketed and sold in similar trade channels to the same target consumer. AC, at ¶¶ 2-3. HVB seeks an injunction restraining TCCC from further engaging in allegedly infringing activities as well as actual damages, costs, and fees as provided under the Lanham Act. Id., at ¶ 4.

### 1. Cause of Action

In its Cause of Action, HVB asserts a claim for trademark infringement of a federally registered mark in violation of Section 32(1) of the *Lanham Act*, codified as 15, United States Code, Section 1114(1). AC, at ¶¶ 56-59. HVB contends that the acts described in the complaint constitute an infringement of a registered mark under the Act, and that TCCC has derived unlawful gains, profited, benefitted, and been otherwise unjustly enriched in the marketplace at the expense of and injury to HVB. Id., at ¶ 58.

### B. Second Amended Counterclaim

In its Second Amended Counterclaim (hereinafter "SAC")(#147), TCCC contends that BNM and Mr. Ryan fraudulently procured the federal registration of the VOLT mark, SAC, at ¶¶ 7-13, that BNM and Ryan lacked an intent to use the VOLT mark, id., at ¶¶ 14-20, and that Mr. Ryan is a "serial trademark applicant" who abuses the federal Trademark registration system. Id., at ¶¶ 21-24. TCCC alleges that Brand

Name Management, a New York Corporation (hereinafter "BNM/NY") filed an intent-to-use application on or about July 23, 1997, seeking to register the VOLT mark, which was executed by Mr. Ryan as President of BNM/NY. Id., at ¶ 8. In January 1998, the United States Patent and Trademark Office (hereinafter "PTO") issued an office action stating that the VOLT application would be suspended in light of a prior pending application to register the BIO VOLT INSTANT ENERGY mark. Id., at ¶ 11. TCCC alleges that BNM/NY was administratively dissolved by the New York Secretary of State on September 23, 1998, and remained in such state of dissolution until 2005. Id., at ¶ 12. TCCC further alleges that in 2001, the PTO issued an office action refusing registration of the VOLT mark after the BIO VOLT INSTANT ENERGY registration matured into registration. Id., at ¶ 15. The PTO sent the office action to BNM/NY's prosecuting attorney, but such was returned as undeliverable, and was eventually received by the prosecuting attorney on or about June 8, 2001, when such attorney provided a new address to the PTO. Id., at ¶¶ 16-18. No response was filed within six months of the issuance of the office action. Id., at ¶ 19.

TCCC contends that BNM/NY and/or Mr. Ryan lacked a bonafide intent to use the VOLT mark at the time the application was filed with the PTO. Id., at ¶ 24. It further contends that BNM and/or Mr. Ryan first intended to use the VOLT mark not

when it made application in 1997, but in 2005 when BNM and/or Mr. Ryan became aware of TCCC's use of the VAULT mark in test marketing its beverage. Id., at ¶ 25. TCCC alleges that because a pending intent-to-use application (with the status that the VOLT application was in at the time) is assignable only "to a successor to the business of the applicant . . . if that business is ongoing and existing," 15 U.S.C. § 1060(a)(1), and because BNM/NY was in a state of dissolution in 2005, Mr. Ryan then took the steps necessary to obtaining an annulment of the dissolution. Id., at ¶ 28. In 2006, TCCC alleges that BNM/NY was merged into BNM (counter claim defendant herein) via a certificate of merger signed by Mr. Ryan in his capacity as an officer of both BNM/NY and BNM. Id., at ¶ 30. Thereinafter, TCCC contends that BNM, HVB, and Mr. Ryan then migrated the VOLT-brand product line from the description of goods for which the federal trademark registration was obtained, into an expanded product line and packaging intentionally designed to mimic TCCC's VAULT brand in an attempt to create confusion between the brands. Id., at 31. TCCC contends that Mr. Ryan, through BNM/NY, used the VOLT mark in commerce to obtain federal trademark registration, with the objective of forcing TCCC to purchase the VOLT mark from him. Id., at 34.

### 1. First Counterclaim

In its First Counterclaim, TCCC seeks a declaratory judgment of non-

infringement against HVB. Id., at ¶¶ 35-39. It denies that it has infringed or is infringing HVB's alleged VOLT trademark and further denies that it has engaged or is engaging in any act or omission giving rise to a cause of action by HVB against TCCC. Id., at ¶ 38.

### 2. Second Counterclaim

In its Second Counterclaim, TCCC alleges that BNM and Mr. Ryan falsely or fraudulently registered the federal trademark VOLT. Id., at ¶¶ 40-50. It contends that such counterclaim defendants lacked a bona fide intent to use the VOLT mark due to Mr. Ryan's alleged serial filing of applications subsequently cancelled or abandoned, because he allowed BNM/NY to become administratively dissolved, and because an intent-to-use application is assignable only as permitted by Title 15. Id., at ¶ 41. It contends that BNM and Mr. Ryan made a false statement to the PTO when they stated that they had a bona fide intention to use the mark when they did not have such an intention, id., at ¶ 42, that they knew such statement was false, id., at ¶ 43, and such statement was material to the trademark examiner's decision to allow the application because the application would not have matured to registration absent such allegedly false statement. Id., at ¶ 44. It also contends that an additional false statement was made to the PTO when BNM and Mr. Ryan caused a statement of use to be filed with the PTO declaring that BNM/NY was the owner of the VOLT mark at a time when

BNM owned the mark, that such statement was knowingly made, and that it was material to the trademark examiner's decision.  Id., at ¶¶ 45-47.

### 3.    Third Counterclaim

In its Third Counterclaim, TCCC seeks a declaration by this court that BNM's federally registered VOLT mark is invalid.  Id., at ¶¶ 51-56.  It contends that the mark was procured through fraud, id., at ¶ 52, that the registration is void due a lack of intent to use by the original applicant, id., at ¶ 53, was abandoned, id., at ¶¶ 54-55, and was ultimately improperly registered.  Id., at ¶ 56.

### 4.    Fourth Counterclaim

In its Fourth Counterclaim, TCCC seeks to pierce the corporate veil as to BNM, contending that such corporation was a mere instrumentality of Mr. Ryan as he allegedly exercised complete domination and control over BNM with respect to the VOLT trademark application and then used his control over BNM to procure from the PTO the VOLT trademark registration by allegedly false and fraudulent means, as discussed above.  Id., at ¶¶ 57-61.

### 5.    Fifth Counterclaim

In its Fifth Counterclaim, TCCC brings a claim under the common law of North Carolina for "Champerty and Maintenance."  Id., at ¶¶ 62-71.  TCCC contends that since 2005, when BNM and Mr. Ryan discovered TCCC's use of the VAULT mark

and renewed their interest in the purportedly abandoned VOLT mark, id., at ¶¶ 25 & 28,[2] Mr. Ryan and/or BNM have marketed this lawsuit to actual and potential investors in the VOLT enterprise as an "exit strategy." Id., at ¶ 63. It contends that BNM was able to secure funding necessary to keep the VOLT enterprise alive only by securing a new investment group that is in the business of funding litigation. Id., at ¶ 66. TCCC further contends that such alleged investors in the litigation are "well versed litigators" familiar with the alleged infirmities with the validity of the VOLT mark and who have infused capital into the VOLT enterprise. Id., at ¶ 67. Further, TCCC contends that this partnership between BNM and the investors culminated in the creation of HVB, plaintiff herein, which was assigned the VOLT trademark rights less than two weeks before this litigation was commenced in 2008. Id., at ¶ 68. TCCC contends that the structure of HVB constitutes champerty and maintenance, and that the new investment group has interfered with BNM's alleged rights in the VOLT trademark, including BNM's long-anticipated trademark infringement claim against TCCC's VAULT mark, in a manner that is clearly officious and for the purpose of stirring up strife and continuing litigation by financing and controlling this lawsuit and providing the funding necessary to sustain the VOLT enterprise while this lawsuit is pending. Id., at ¶ 70.

---

[2]    As incorporated into the Fifth Counterclaim in ¶ 62.

## II.    Cross Motions for Partial Summary Judgment

TCCC has filed a Motion for Partial Summary Judgment (#197) contending that it is entitled to summary judgment on its counterclaim seeking cancellation of the VOLT mark, on HVB's claim of trademark infringement because VOLT's alleged priority over VAULT rests solely on an invalid mark, on its counterclaim of false procurement of the VOLT mark, and on HVB's trademark infringement claim against VAULT RED BLITZ and VAULT ZERO.  For the reasons that follows, the court finds that genuine issues of material fact prohibit the requested relief necessitating resolution by a jury, except as to TCCC's Motion for Summary Judgment as to HVB's claims concerning VAULT RED BLITZ and VAULT ZERO.

HVB, BNM, and Mr. Ryan have also filed their Motion for Partial Summary Judgment (#199) contending that they are entitled to entry of judgment in their favor on TCCC's affirmative defenses of laches, acquiescence, abandonment, and fraudulent procurement; on TCCC's Second Counterclaim for Fraudulent Procurement of a Trademark Registration; and on TCCC's Fifth Counterclaim for Champerty and Maintenance.  For the reasons that follow, the court finds that genuine issues of material fact prohibit the requested relief.

### A.    Cross Motions for Summary Judgment: Applicable Standard

In this case, cross-motions for partial summary judgment have been filed.

Where cross motions for summary judgment are filed, such motions are

> no more than a claim by each side that it alone is entitled to summary
> judgment, and the making of such inherently contradictory claims does
> not constitute an agreement that if one is rejected the other is necessarily
> justified or that the losing party waives judicial consideration and
> determination whether genuine issues of material fact exist. If any such
> issue exists it must be disposed of by a plenary trial and not on summary
> judgment.
>
> In short, the mere fact that both parties seek summary judgment
> does not constitute a waiver of a full trial or the right to have the case
> presented to a jury.

Wright & Miller, 10A Fed. Prac. & Proc. Civ.3d § 2720. Such reasoning is especially

apt where, as here, neither side seeks judgment on all claims.

On a motion for summary judgment, the moving party has the burden of

production to show that there are no genuine issues for trial. Upon the moving party's

meeting that burden, the non-moving party has the burden of persuasion to establish

that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its
> opponent must do more than simply show that there is some
> metaphysical doubt as to the material facts. In the language of the Rule,
> the nonmoving [sic] party must come forward with "specific facts
> showing that there is a *genuine issue for trial*." Where the record taken
> as a whole could not lead a rational trier of fact to find for the non-
> moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)

(citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must

be more than just a factual dispute; the fact in question must be material and readily

Case 3:08-cv-00367-GCM -DLH   Document 240   Filed 12/16/10   Page 10 of 47

identifiable by the substantive law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242

(1986).

By reviewing substantive law, the court may determine what matters constitute

material facts.  <u>Anderson</u>, <u>supra</u>.  "Only disputes over facts that might affect the

outcome of the suit under governing law will properly preclude the entry of summary

judgment."  <u>Id.</u>, at 248.  A dispute about a material fact is "genuine" only if the

evidence is such that "a reasonable jury could return a verdict for the nonmoving

party."  <u>Id.</u>  The court must credit factual disputes in favor of the party resisting

summary judgment and draw inferences favorable to that party if the inferences are

reasonable, however improbable they may seem.  <u>Cole v. Cole</u>, 633 F.2d 1083, 1092

(4th Cir. 1980).  Affidavits filed in support of a Motion for Summary Judgment are

to be used to determine whether issues of fact exist, not to decide the issues

themselves.  <u>United States ex rel. Jones v. Rundle</u>, 453 F.2d 147 (3d Cir. 1971).

When resolution of issues of fact depends upon a determination of credibility,

summary judgment is improper.  <u>Davis v. Zahradnick</u>, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible

evidence of the non-moving party must be believed and all justifiable inferences must

be drawn in his or her favor. <u>Anderson</u>, <u>supra</u>, at 255.  In the end, the question posed

by a summary judgment motion is whether the evidence "is so one-sided that one

party must prevail as a matter of law." Id., at 252.

**B.      TCCC's Motion for Partial Summary Judgment**

In its Motion for Partial Summary Judgment (#197), TCCC contends that it is entitled to summary judgment on its Third Counterclaim seeking cancellation of the VOLT mark, on HVB's claim of trademark infringement because VOLT's alleged priority over VAULT rests solely on an invalid mark, on TCCC's Second Counterclaim of false procurement of the VOLT mark, and on HVB's trademark infringement claim against VAULT RED BLITZ and VAULT ZERO.      The undersigned will review each subcontention *seriatim*.

**1.      Summary Judgment as to the Third Counterclaim Seeking Cancellation**

TCCC contends that it is entitled to summary judgment on its Third Counterclaim, which seeks cancellation of the VOLT mark.  It is clearly within this court's jurisdiction to grant or deny the relief requested: "In any action involving a registered mark the court may . . . order the cancellation of registrations, in whole or in part." 15 U.S.C. § 1119.  Inasmuch as the proposed cancellation is based on required events or actions that TCCC contends did or did not occur, a brief discussion of the history of establishing federally recognized marks is appropriate.

Because trademark rights were established only by *actual use* at common law, Aktieselskabet AF 21 v. Fame Jeans, Inc., 525 F.3d 8, 20 (D.C. Cir. 2008), a federal

trademark applicant could only apply for federal registration if the applicant was currently using the mark in commerce. WarnerVision Entm't Inc. v. Empire of Carolina, Inc., 101 F.3d 259, 260 (2d Cir. 1996). That traditional practice was, however, changed by Congress in 1988 when it passed the *Trademark Law Revision Act* of 1988 (hereinafter "TLRA"), which allowed a trademark applicant to file an "intent to use" (hereinafter "ITU") application to register a mark not then used in commerce. Obviously, this new system left the door open for unscrupulous applicants to file an ITU application where they actually had no intent to use such mark in commerce. The TLRA addresses such potential for abuse by requiring the trademark applicant to have a "bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce." 15 U.S.C. § 1051(b)(1). The TLRA goes on to provide that the phrase "use in commerce" means "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." Id., at § 1127. Further, an application cannot mature into a registration until the applicant files a verified "Statement of Use" (hereinafter "SOU") showing the required use of the mark. Id., at § 1051(d)(1).

TCCC contends in its motion that: (1) BNM/NY lacked the required bona fide intent when it filed the application in 1997; (2) that such application was abandoned in 2001 when BNM/NY, a defunct corporation, failed to timely respond to the PTO's

notice of office action; and (3) that the application was again abandoned in 2006 when the applicant failed to file a timely SOU.

### a. Bona Fide Intent

TCCC first contends that summary judgment should be granted on its Third Counterclaim seeking cancellation because neither HVB, BNM, nor Mr. Ryan had the required bona fide intent to use the VOLT mark in the ordinary course of trade when the application was filed in 1997, and that such application was made merely to reserve a right in a mark. The court agrees with TCCC's characterization of the TLRA, in that it requires "both actual intent to use a mark in commerce and evidence . . . that objectively demonstrates such intent." Aktieselskabet AF 21, 525 F.3d at 21. TCCC's Memorandum in Support (#198), at p. 3. The court also agrees with HVB's argument that the issue of bona fide intent is "ill-suited to summary disposition." Response (#210), at p. 3. " As has been stated numerous times, issues of intent are particularly unsuited to disposition on summary judgment." Telos Corp. v. Telestrategies, 2005 TTAB LEXIS 53, at *6 (TTAB 2005)(quoting Copelands' Enters., Inc. v. CNV Inc., 945 F.2d 1563, 1567 (Fed. Cir. 1991)).[3]

As the proponent of cancellation, TCCC's bears the initial burden of coming

---

[3] Due to the limits of Electronic Case Filing, a copy of such unpublished decision is placed in the electronic docket through incorporation of the LEXIS citation. While TTAB decisions are not precedential, they have persuasive value with reviewing courts as they represent the considered opinions of highly specialized adjudicators.

forward with evidence upon which the finder of fact could determine that the mark should be cancelled based on a lack of actual intent to use the mark in commerce coupled with evidence that objectively demonstrates such intent. TCCC contends that (1) the counterclaim defendants lack the required documentary evidence; (2) BNM/NY lacked any real existence as a commercial enterprise and instead was merely a repository for Mr. Ryan's impermissible intent to reserve a right in the VOLT mark; and (3) Mr. Ryan's trademark filing history disproves any bona fide intent. Assuming that TCCC could satisfy its initial burden, the court's focus shifts to what evidence the non-moving parties have produced on this issue.

First, HVB points to actual later use of the mark in commerce, which it contends substantiates the applicant's intention and moots the prior intent issue. The TTAB reached a similar conclusion in <u>Telos Corp.</u>, <u>supra</u>, denying summary judgment where an applicant actually used the mark. The court agrees that a jury could determine that actual use starting in 2006 corroborates the 1997 declaration of intent to use, creating a material issue of fact.

Second, HVB points out that it has produced documentation evincing its intent to use the mark. HVB contends and has produced some evidence that Mr. Ryan, through, BNM, began as early as 1996 developing informal business and marketing plans, designed labels bearing proposed VOLT logos, and researched the marketplace

for competing soft drinks. Ryan Affidavit, at ¶¶ 17 & 19. HVB has attached the labels Mr. Ryan designed in 1996 as Exhibits D and E to Mr. Ryan's affidavit.

As the jurisprudence surrounding Rule 56 prohibits the court from weighing the evidence, the undersigned finds that HVB has produced sufficient evidence to demonstrate a genuine issue of material fact exists inasmuch as it has produced documentary evidence which, if believed, could form the basis of a jury finding that the applicant had "both actual intent to use a mark in commerce and evidence . . . that objectively demonstrates such intent." Aktieselskabet AF 21, 525 F.3d at 21.

**b.     Abandonment in 2001**

TCCC next contends that it is entitled to summary judgment on this counterclaim because the application was abandoned in 2001 when the notice of office action, sent by the PTO to BNM/NY's counsel was returned as undeliverable. TCCC contends that BNM/NY was required to file a response to the office action within six months, which would have been September 29, 2001, that BNM/NY failed to meet that deadline, and that an application is abandoned when the applicant fails to so respond within that time period. Memorandum in Support (#198), at 13-14, citing 15 U.S.C. § 1062(b).

HVB has, however, presented evidence that the applicant's counsel responded to the notice within the time provided by the examiner in the letter that it eventually

-16-

received.   TCCC contends that this is simply boilerplate and that the examiner

mistakenly exceeded his authority in reopening the time as such was beyond the time

allowed by the *Trademark Manual of Examining Procedure*.   While TCCC has

provided authority for the proposition that an examiner lacks authority to reopen a

missed deadline, <u>Societe des Produits Nestle S.A. v. Basso Fedele & Figli</u>, 24

U.S.P.Q.2d 1079, 1080 (TTAB 1992), the procedural safeguard inherent in actually

missing a deadline (which is a notice of abandonment and opportunity to petition to

revive) would be absent in the scenario now before the court.   If accepted, TCCC's

view of agency law has the potential of lulling a applicant, who is in the midst but not

otherwise outside the time allowed, to rely on the time provided in the notice to their

detriment.   Unlike the scenario in <u>Nestle</u>, reliance on the time provided in the notice

would, in situations such as the one before this court, be without the procedural

safeguards present in an abandonment declared at the administrative level, which are

notice and an opportunity to cure.   As in this case, TCCC's administrative rule could

result in abandonment being declared by a trial court, resulting in cancellation of a

mark years after the response was supposedly filed out-of-time.   The court does not

find this to be a reasonable or practical reading of 15, United States Code, Section

1062(b), as it would not only be contrary to due process, it would encourage

challengers to pocket what would then be a remediable error, if raised during the

examination process, until such time as it became a fatal error in a civil action.

The court cannot find, as a matter of law, that TCCC is entitled to summary judgment on its counterclaim of cancellation based on abandonment in 2001.

### c.     Abandonment in 2006

TCCC next contends that the VOLT mark should be cancelled because the applicant again abandoned such mark in 2006 through failure to timely submit a SOU. It contends that the mark was abandoned when BNM/NY filed the SOU rather than BNM, to which the mark had then been assigned . TCCC appears to argue that because the application was then *assigned* to BNM, it was the correct party to file the SOU in 2006, not BNM/NY.   HVB contends that BNM/NY was the correct party to file the SOU inasmuch as the application was never "assigned" inasmuch as BNM/NY was merged with BNM a month before the SOU was filed.

While proffering other arguments,[4] HVB argues that it was a legal impossibility for BNM/NY to file the SOU on November 14, 2006, because on that date, BNM/NY no longer existed, having merged on October 24, 2006, into BNM.  Inasmuch as the corporation into which BNM/NY merged was a Delaware corporation, upon merger, the "separate existence" of the merging corporation "shall cease." See 8 Del. C. §

---

[4]     HVB argues persuasively that BNM/NY was not, in fact, the entity that filed the SOU inasmuch as TCCC appears to base its argument on a New York return address on the SOU.

**-18-**

259(a).  Under Delaware law, in a merger "all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation." See 8 Del. C. § 259(a).  Thus, it was quite proper for BNM to have filed the SOU the following month as it was, by virtue of being the surviving corporation, the owner of the application at that time.[5]

The undersigned cannot find, as a matter of law, that TCCC is entitled to summary judgment on the issue of cancellation of the VOLT mark based on abandonment in 2006.

\* \* \*

The undersigned will, therefore, recommend that TCCC's Motion for Summary Judgment on its Third Counterclaim be denied as genuine issues of material fact exist on such counterclaim.

### 2.    Summary Judgment as to HVB's Claim of Trademark Infringement

TCCC next seeks summary judgment on HVB's claim of trademark infringement, contending that VOLT's alleged priority over VAULT rests solely on an invalid mark.  Such motion appears contingent, however, on this court granting

---

[5]    TCCC also takes issue with BNM's failure to notify the PTO of the merger prior to filing the SOU, contending that such error is fatal.  The law does not, however, appear to countenance such a draconian result, as "[f]ederal recordation of an assignment is permissive, not mandatory." McCarthy § 18:11, at 18-23.

summary judgment on TCCC's counterclaim seeking cancellation of the VOLT mark.[6]

As summary judgment is not available on TCCC's counterclaim seeking cancellation for the reasons discussed immediately above, the undersigned must respectfully recommend that TCCC's Motion for Summary Judgment on HVB's claim of trademark infringement also be denied.

### 3. Summary Judgment as to TCCC's Second Counterclaim of False Procurement of the VOLT Mark

TCCC next seeks summary judgment on its Second Counterclaim, in which it alleges that the VOLT mark was falsely procured. The Lanham Act provides that:

> [a]ny person who shall procure registration in the Patent and Trademark Office of a mark by a false . . . declaration or representation . . . shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

15 U.S.C. § 1120. In this motion, TCCC again challenges whether BNM/NY had a "bona fide intention to use the mark in interstate commerce on or in connection with the above-identified goods" when it applied for the mark in 1997. As discussed above, however, a genuine issue of material fact exists for resolution by the fact finder on such issue, making summary judgment equally unavailable on TCCC's Second Counterclaim for false procurement. For the reasons stated above, the undersigned must respectfully recommend that this motion also be denied.

---

[6] "If the VOLT federal trademark registration is cancelled, VAULT is entitled to priority by virtue of its common law rights." Memorandum in Support (#198), at 23.

## 4. Summary Judgment as to HVB's Trademark Infringement Claims against VAULT RED BLITZ and VAULT ZERO.

Finally, TCCC seeks summary judgment on HVB's trademark infringement claim against VAULT RED BLITZ and VAULT ZERO. While the thrust of the Amended Complaint concerns the allegedly infringing use of the VAULT mark, the Amended Complaint also contains one specific reference to VAULT RED BLITZ and VAULT ZERO, AC, at ¶ 37, and otherwise references infringing *"marks"* in the plural form. First, the direct reference to such additional marks, or combination of marks, is found in a factual allegation of the Amended Complaint:

> 37. On December 17, 2004, March 28, 2005, March 31, 2005, August 24, 2005, and October 16, 2006, respectively, Coke filed in the USPTO intent-to-use applications to register various versions of the VAULT Marks, including VAULT in International Class 32 for "nonalcoholic beverages, namely soft drinks; syrups and concentrates for making soft drinks" (Application Serial No. 78/534,888); VAULT for in International Class 32 for "energy drinks" (Application Serial No. 78/595,891); V VAULT and Design in International Class 32 for "nonalcoholic beverages, namely soft drinks and energy beverages; syrups and concentrates for making soft drinks and energy beverages" (Application Serial No. 78/599,327); **VAULT ZERO** in International Class 32 for "non-alcoholic beverages, namely, soft drinks and energy drinks; syrups and concentrates for making soft drinks and energy drinks" (Application Serial No. 78/698,990); and **VAULT RED BLITZ** in International Class 32 for "non-alcoholic beverages, namely, soft drinks and energy drinks; syrups and concentrates for making soft drinks and energy drinks" (Application Serial No. 77/021,871) (collectively, the "Coke VAULT Applications").

AC, at ¶ 37 (emphasis added). Second, HVB references TCCC's "marks" in the

plural form throughout the Amended Complaint, alleging, for example, that

> 45.   Coke's VAULT **Marks** are confusingly similar to HVB's VOLT
>        Mark. The first and last two letters of each mark are the same, and
>        the marks are pronounced very similarly.

Id., at ¶ 45 (errors in capitalization in the original). See also ¶ 2,46, 48, 49, 50, 51, 52,

53, & Prayer for Relief, at i. & v.

In response, HVB argues that TCCC has not carried its initial burden under

Rule 56, pointing out that TCCC has not addressed each factor courts review in a

likelihood-of-confusion analysis. HVB's Response (#210), at p. 24. While HVB is

correct that TCCC has not addressed each factor, such lack of analysis is not

ascribable to lack of effort on the part of TCCC, but to a lack of evidence adduced as

to VAULT RED BLITZ and VAULT ZERO.

HVB argues that the factor addressed by TCCC, i.e., the similarity of the

marks, has been done in a conclusory fashion. HVB argues that in actual use, the

VAULT mark is dominant in each variation, with the other marks RED BLITZ and

ZERO being secondary. Id. HVB points to (1) photographs of the products, (2)

deposition testimony concerning trade channels, and (3) HVB's response to

Interrogatory No. 10. With the exception of the photographs, review of such evidence

does not reveal any reference to VAULT RED BLITZ and VAULT ZERO. While

it is uncontested that there is sufficient evidence of actual confusion between the

marks VAULT and VOLT to go forward, there is simply no evidence of actual or likely confusion concerning VAULT RED BLITZ and VAULT ZERO other than what can be garnered from looking at pictures of cans of product.

Recently, the Court of Appeals for the Fourth Circuit revisited its likelihood-of-confusion analysis,[7] and provided guidance in the form of a seven-factor test for likelihood-of-confusion between marks. Determining likelihood-of-confusion requires consideration of the following:

(1)     the strength or distinctiveness of the marks;
(2)     the similarity of the marks;
(3)     the similarity of the goods and services the marks identify;
(4)     the similarity of the facilities the parties use in their businesses;
(5)     the similarity of advertising used by the parties;
(6)     the defendant's intent;
(7)     actual confusion;
(8)     the quality of the defendant's product; and
(9)     the sophistication of the consuming public.

George & Co. v. Imagination Entm't Ltd., 575 F.3d 383, 393-94 (4th Cir. 2009). As discussed above, the only evidence even referencing VAULT RED BLITZ and VAULT ZERO consists of photographs from which one can perform a visual comparison between the products. These photographs arguably bear only on factors (2) and (3). As the proponent of the claim against the VAULT RED BLITZ and VAULT ZERO marks, it was HVB's burden to come forward with some evidence

---

[7]     For a earlier analysis involving additional factors, see Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984).

upon which this court on summary judgment and a jury later at trial could conduct the required analysis.  Applied Info. Scis. Corp. v. eBay, Inc., 511 F.3d 966, 973 (9th Cir. 2007) (affirming district court's finding of no likelihood of confusion where plaintiff failed to produce any admissible evidence addressing relevant factors).

The first factor requires this court to consider the strength or distinctiveness of the marks.  Id.  HVB has provided no evidence to support an analysis of factor (1). Typically, the court would expect to see evidence concerning the amounts spent advertizing and otherwise promoting the junior mark.  Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 474 (3d Cir. 2005).  As to the other factors, courts expect to see consumer surveys and review expert analysis.  As other courts in the Fourth Circuit have found, such lack of evidence is out of the ordinary and hampers the decision making process.

> Before addressing these factors, it is worth noting that George has not presented any survey evidence of consumer confusion. Although surveys are not required to prove likelihood of confusion, they are increasingly common. *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 661 (4th Cir.1996) ("[S]urveys are not required to prove likelihood of confusion."); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:195 ("As the use of surveys has become more common, judges have come to expect that a survey will be introduced to aid the court in determining customers' state of mind."). Given that George bears the ultimate burden of proving a likelihood of confusion by a preponderance of the evidence, the lack of survey evidence, while not fatal, severely hampers George's ability to meet that burden.

-24-

George & Co., LLC v. Imagination Entertainment Ltd., 2008 WL 2883771 (E.D.Va. Jul. 25, 2008).[8] Other than the photographs, no evidence relevant to the seven factors has been tendered. The court has no evidence concerning the similarity of the facilities the parties use in their businesses; the similarity of advertising used by the parties; the defendant's intent; actual confusion; the quality of the defendant's product; and the sophistication of the consuming public.

The undersigned must, therefore, recommend that TCCC's Motion for Summary Judgment as to the infringement claims based on VAULT RED BLITZ and VAULT ZERO be allowed, and that judgment be granted in favor of TCCC and against HVB on those claims.

### C. HVB's, BNM's, and Mr. Ryan's Motion for Partial Summary Judgment

#### 1. Introduction

HVB, BNM, and Mr. Ryan have moved for summary judgment on TCCC's affirmative defenses of laches, acquiescence, abandonment, and fraudulent procurement; Second Counterclaim for Fraudulent Procurement of a Trademark Registration; and Fifth Counterclaim for Champerty and Maintenance. At the

---

[8] Due to the limits of Electronic Case Filing, a copy of such unpublished decision is placed in the electronic docket through incorporation of the Westlaw citation. Pagination unavailable as of 10/26/2010.

-25-

conclusion of the August 2010 hearing, additional time for discovery was allowed on this motion, and a supplemental response as well as a supplemental reply were timely filed and considered by the undersigned in addition to the other pleadings of record. To a certain extent, such motion is merely the "flip side" of TCCC's Motion for Summary Judgment on a number of its contentions.

Generally, HVB, BNM, and Mr. Ryan argue that such defenses are legally baseless. They contend that the laches defense fails because HVB's right to sue for infringement only ripened when its VOLT trademark registration issued 16 months before this action was commenced, which was well within the applicable four-year statute of limitations. They contend that the related defense of acquiescence fails because there is no evidence of HVB's "active consent" to Coke's ongoing infringement, that the affirmative defense of "abandonment" appears to be a misnomer as there is no record evidence that HVB ceased use of its VOLT mark with an "intention not to resume use" and as to abandonment of the application, the technical defects during the VOLT registration process do not support any defense in this case. They also seek summary judgment on TCCC's Counterclaim for Fraudulent Procurement, contending that mere evidence that it incurred attorneys fees is insufficient as a matter of law to satisfy the element of damages and lacks clear and convincing evidence of applicant's deliberate intent to deceive the PTO. Finally,

summary judgment is sought on TCCC's Counterclaim for Champerty and Maintenance, contending that TCCC lacks standing to bring the claim, that HVB cannot be a "stranger" to its own rights asserted in this litigation, that there is no evidence that HVB "officiously intermeddled" by prompting BNM to bring a suit it otherwise did not intend to assert, and that TCCC has no evidence that it suffered cognizable damages.

## 2. Affirmative Defense of Laches

Clearly, the defense of laches asserted by TCCC applies, if at all, to HVB's request for money damages and not to its claim for injunctive relief.

> [I]f the claim is one for injunctive relief, laches would not apply. A prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm. Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches.

Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 799 (4th Cir. 2001). [9] When asserting a defense of laches to a monetary relief, a defendant must present evidence that the plaintiff unreasonably delayed challenging the infringement and that such delay resulted in undue prejudice to the defendant. What-A-Burger of Va., Inc. v. Whataburger, inc., 357 F.3d 441, 448-49 (4th Cir. 2004). The challenge need not come as soon as plaintiff discovers the infringing use, but when the right to protection

---

[9] TCCC has cited a number of cases that predate Lyons for the proposition that laches may bar injunctive relief, although it is sparingly applied to claims for equitable relief. TCCC's Response (#207), at 1.

under the Lanham Act ripened.  Id., at 449.  HVB contends that its right to pursue a claim for infringement did not ripen until April 17, 2007, when its ITU application was registered by the PTO.  The Court of Appeals for the Fourth Circuit explained the importance of the doctrine of laches in federal trademark litigation, as follows:

> Because the Lanham Act does not include a limitations period, courts use the doctrine of laches to address the inequities created by a trademark owner who, despite having a colorable infringement claim, allows a competitor to develop its products around the mark and expand its business, only then to lower the litigation boom.

What-A-Burger of Va., Inc., 357 F.3d at 448.

Review of the proffered evidence reveals that Mr. Ryan knew of the alleged infringing use of the VAULT mark in June 2005, saving a screen shot of the alleging infringing product on June 17, 2005.  Ryan Depo., at pp. 113-15.  HVB argues this act has no significance as their right to bring an action for infringement did not accrue until April 17, 2007, when the VOLT application matured into a registration.  The TLRA provides, as follows:

> Contingent on the registration of a mark, the filing of the [ITU application] shall constitute constructive use of the mark, conferring a right of priority, nationwide in effect, on or in connection with goods or services specified in the registration against any other person.

15 U.S.C. § 1057(c).

If this court were to read the TLRA and applicable case law in the manner suggested by HVB, trademark applicants would be encouraged to lurk behind their

-28-

applications indefinitely and not seek registration until an alleged infringer had spent millions in promoting and establishing its allegedly infringing mark, an expenditure which would enure to the benefit of the owner of the senior mark as such expenditures are used to gauge damages. Indeed, such a strained reading would also have the effect of putting the applicable statute of limitations[10] in indefinite suspended animation, allowing it to commence only when the offended party decided to register their mark.

As both laches and the ITU applicant process both employ equitable principles, the court believes the better date from which to adjudge laches is the date on which the applicant becomes aware of the purportedly infringing use, June 17, 2005. The pertinent question is whether laches is unavailable where, as here, plaintiff brought the action within the four year limitations period as laches is presumptively inapplicable in such circumstances. Lyons P'ship, L.P., 243 F.3d at 799. TCCC argues that it can rebut this presumption by presenting compelling evidence, including evidence that rather than sending a cease an desist letter to TCCC after discovering the allegedly infringing use on June 17, 2005,[11] Mr. Ryan did the following :

---

[10]    The statute of limitations for a Lanham Act claim for infringement is drawn from state law as the Act contains no statute of limitations. Clear Blue, Inc. v. Clear!Blue, Inc., 2008 U.S. Dist. LEXIS 73398, at *3-4 (W.D.N.C. Aug. 29, 2008) (presuming 4-year statute for trademark infringement claims).

[11]    At the hearing, the court inquired of the parties as to whether a cease and desist letter was ever sent by HVB, BNM, or Mr. Ryan and respective counsel agreed that none had been sent.

-29-

(1)      he went to a beverage flavoring company and directed them to make a product with a taste profile "similar to Vault (Coke product)," Rocco Dep., at 19-23; and

(2)      he prepared investment summaries touting plans to bring this lawsuit as an "exit strategy" and gave investor presentations saying VOLT would "ride the coattails" of VAULT. Ryan Dep., at 195-96, 199-206 & Exs. 212, 214. One such investor summary from September 2005 predicted opposition of the VAULT trademark registration would:

> delay the VAULT trademark issuance, and the PR surrounding the opposition will create chaos and insecurity in the Coke bottler system and impact Coke management's [credibility] with key Wall Street analysts.

Ryan Dep., at 187 & Ex. 210.

Further, TCCC contends that when questioned about a December 2005 investor summary that referred to "VOLT vs. VAULT market confusion," Mr. Ryan explained that by then the market confusion was "no longer a theory. There was confusion." Ryan Dep., at 209-10.

The court finds that TCCC has presented evidence which, taken as true for the limited purpose of the pending motion, rebuts the presumption that laches is unavailable where an action is brought within the period of limitations. Indeed, Mr.

Ryan and subsequently HVB could have avoided a defense of laches simply by sending TCCC a cease and desist letter in June 2005, because "any time lapse after a trademark plaintiff issues a cease and desist letter to the defendant does not count for the purposes of laches[.]" Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc., 616 F.Supp.2d 622, 634 (N.D.Tex. 2009). Instead, it appears from the evidence presented, considered in a light most favorable to the party resisting summary judgment, that Mr. Ryan not only allowed damages to accrue, but actively took steps to increase his own damages. TCCC has presented evidence that from 2005 until 2008, it expended some $180,000,000.00 promoting the VAULT brand. Response (#207), Ex. F. ( TCCC's Supp. Resp. to Interrogs. 14 & 15).

A defense based on the doctrine of laches asks a jury to decide whether the proponent of the litigation unreasonably delayed in bringing the action. While the proponent can certainly put on evidence that the action was brought within the statute of limitations, and even ask for an instruction as to the presumption, simply bringing the action within the limitations period is not conclusive - - if it were, there would be no need for a defense of laches. The North Carolina Supreme Court has long held as follows:

> [i]n equity, where lapse of time has resulted in some change in the
> condition of the property or in the relations of the parties which would
> make it unjust to permit the prosecution of the claim, the doctrine of
> laches will be applied. Hence, what delay will constitute laches depends

upon the facts and circumstances of each case. Whenever the delay is mere neglect to seek a known remedy or to assert a known right, which the defendant has denied, and is without reasonable excuse, the courts are strongly inclined to treat it as fatal to the plaintiff's remedy in equity, even though much less than the statutory period of limitations, if an injury would otherwise be done to the defendant by reason of the plaintiff's delay.

Teachey v. Gurley, 214 N.C. 288, 294 (1938). The North Carolina Supreme Court has also held that the defense of laches

is one 'frequently raised by summary judgment motion.' When it is so raised the plaintiff, of course, 'is permitted to counter by showing a justification for the delay, and whenever this assertion raises triable issues, defendant's motion will not be granted.' 10 C. Wright & A. Miller, Federal Practice and Procedure s 2734 (1973).

Taylor v. City of Raleigh, 290 N.C. 608, 622 (1976). In this case, TCCC has come forward with evidence that HVB's delay in bringing this action "has resulted in some change in the condition of the property or in the relations of the parties which would make it unjust to permit the prosecution of the claim . . . ." Teachey, supra. Finding that genuine issues of material fact remain, the undersigned will recommend that this motion be denied.

### 3. Affirmative Defense of Acquiescence

TCCC has conceded that "the motion may be granted with respect to TCCC's acquiescence defense. TCCC's laches defense renders any acquiescence defense superfluous." Response (#207), at f.n. 1. The undersigned will, therefore, recommend

-32-

that summary judgment be granted on the affirmative defense of acquiescence.

### 4.     Affirmative Defense of Abandonment

In this Motion for Summary Judgment, HVB argues that TCCC has failed to allege or produce any evidence supporting its affirmative defense that HVB abandoned its VOLT mark.   The undersigned incorporates herein its extensive discussion of abandonment in the context of TCCC's Motion for Summary Judgment on its Counterclaim of Abandonment.   While the undersigned earlier determined that summary judgment on the Counterclaim of Abandonment was prevented by genuine issues of material fact, HVB is simply incorrect when it asserts that TCCC has failed to present any evidence of abandonment.   TCCC has presented evidence upon which a jury could determine that the VOLT mark was abandoned (1) when BNM/NY lacked the corporate authority to engage in any new business while it was dissolved from 1998 to 2005, (2) when BNM/NY failed to timely respond to an office action in 2001, and (3) when the true owner failed to file a SOU by the statutory deadline in 2006.   A federal trademark registration is subject to cancellation on the ground of abandonment at any time. 15 U.S.C. § 1115(b)(2).   A trademark is abandoned

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from the circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of that mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

-33-

15 U.S.C. § 1127. Statutory abandonment requires a showing of: (1) non-use by the legal owner; and (2) no intent to resume use in the reasonably foreseeable future by the legal owner.  George & Co. LLC, 575 F.3d at 401.  Although such evidence is in dispute, as discussed above, it is sufficient to create a genuine issue of material fact on the affirmative defense of abandonment.  Finding that genuine issues of material fact remain, the undersigned will recommend that this  motion be denied.

### 5.    Counterclaim and Affirmative Defense of Fraudulent Procurement

As discussed earlier in the context of TCCC's Motion for Summary Judgment, the Lanham Act provides that:

> [a]ny person who shall procure registration in the Patent and Trademark Office of a mark by a false . . . declaration or representation . . . shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

15 U.S.C. § 1120.  Both the counterclaim and the affirmative defense of fraudulent procurement pivot on whether BNM/NY had a "bona fide intention to use the mark in interstate commerce on or in connection with the above-identified goods" when it applied for the mark in 1997.  As discussed above, however, a genuine issue of material fact exists for resolution by the fact finder on such issue, making summary judgment equally unavailable on HVB's Motion for Summary Judgment. For the reasons stated above, the undersigned must respectfully recommend that this motion

also be denied.

### 6.     Counterclaim for Champerty and Maintenance

While not always recognized as a viable tort in other common law jurisdictions,

see Security Underground Storage v. Anderson, 347 F.2d 964, 969 (10th Cir.1965),

the tort of champerty and maintenance remains cognizable under current North

Carolina's law. Odell v. Legal Bucks, LLC, 192 N.C.App. 298 (2008); Oliver v.

Bynum, 592 S.E.2d 707 (N.C. App. 2004). While traditionally brought as one claim,

as in this case, the elements of champerty are separate from the elements of

maintenance. The elements of the common law tort of maintenance are (1) officious

intermeddling in a suit, (2) which does not belong to the intermeddler, (3) by

maintaining or assisting either party with money or otherwise to prosecute or defend

it. Smith v. Hartsell, 63 S.E. 172, 174 (N.C. 1908). Champerty, a conjoined sister to

maintenance, occurs when  (1) a stranger to the suit (the champertor), (2)  bargains

with a party, (3) to divide the proceeds of the suit between them if they prevail at law,

(4) with the champertor carrying the expenses of the suit. Id. Champerty and

maintenance will be found only where "the interference is clearly officious" and for

the purpose of stirring up "strife and continuing litigation." Id.

Champerty and maintenance generally occurs when two or more parties make

an arrangement to divide the proceeds of litigation between the owner of the chose in

action and the party who either supports or acts to enforce the litigation.

> Maintenance consists in maintaining, supporting or promoting the litigation of another, with most courts requiring that the maintaining party act as an officious intermeddler and be without any interest in the litigation. Champerty is a bargain to divide the proceeds of litigation between the owner of the litigated claim and the party supporting or enforcing the litigation. Champerty is said to be a species of aggravated maintenance. It seems entirely possible, however, to have an agreement to divide the proceeds of litigation without any agreement to pay its expenses. The early law was extremely severe, not only with respect to champerty but also with regard to maintenance, and statutes were passed subjecting those guilty of the offense to severe punishment. It is not necessary, however, to consider the history of the subject in detail; it is enough to consider how far the principles of the early law still apply to make agreements having maintenance or champerty for their object invalid.

7 Williston on Contracts, § 15:1 (2009).

### a.    Stranger to the Lawsuit

HVB first argues that it is not a stranger to the lawsuit because it owns the claim, requiring dismissal of the action.  TCCC has, however, presented evidence upon which a jury could find that HVB is a stranger to the lawsuit because the interest it obtained in the lawsuit is not distinct from the interest acquired from the party maintained.  The "stranger" element of a champerty and maintenance claim is satisfied when the champertor does not have a pre-existing interest in the lawsuit distinct from the interest acquired from the party maintained.  <u>American Hotel Mgmt. Assoc., Inc. v. Jones</u>, 768 F.2d 562, 570-71 (4th Cir. 1985) (no champerty where "pre-existing

-36-

interest" sufficiently distinguished conduct from an "officious intermeddler" who was a stranger to the dispute).  TCCC has presented evidence that:

(1)     Context Balance Capital, L.P. was designed to be "a capital provider for under-capitalized plaintiffs with high value, complex commercial legal claims," Response (#207), at Ex. E (Bartle Dep., at 166 & Ex. 522, at HVB43373;

(2)     that it was designed as a private equity fund intended to  provide capital to companies with significant legal claims by investing through various transactional structures to fund the enforcement of those legal claims and, thereby, obtain an interest in such claims and/or share in their proceeds, id., at 172 & Ex. 523, at H3221;

(3)     the fund was managed by three experienced litigators—Camille S. Andrews, Neal C. Belgam, and Edward W. Millstein, id., at Ex. 522, at HVB43391-93; Ex. 523, at H3222, H3239-3243;

(4)     the Context Balance business model targeted "cases – minimum potential expectancy > $20 M" with a "probability of success >70%," id., at Ex. 522, at HVB43387;

(5)     Context Balance engaged legal counsel to assess questions of champerty and maintenance, id., at   HVB43390, and identified "Champerty

Doctrines" as one of the main risks for prospective investors, id., at Ex. 523, at H3256, H3263;

(6)     on November 28, 2007, Context Balance and BNM signed a preliminary Letter Agreement, id., at 196-97 & Ex. 535;

(7)     on December 13, 2007, individuals from BNM and Context Balance attended a "TM discussion" meeting with Howard Shire at the law offices of Kenyon & Kenyon, id., at 198-200 & Ex. 536;

(8)     Kenyon & Kenyon was BNM's lead trademark counsel, Response (#207), Ex. A (Ryan Dep., at 257-259) & Ex. 240, at BNM16718;

(9)     four days later, Bartle reported that "from Context's perspective the meeting . . . went 'very well'" and that Shire "did very well and considerably beefed up their sanguinity about the case," id., at Ex. D (Mitchell Decl. & Ex. 3);

(10)    Context Balance engaged Bill Sipper to perform a valuation of VAULT, id., at Ex. H (Sipper Dep. at 246-247) & Ex. 342, the valuation report, completed on March 21, 2008, valued VAULT at $400 million, id., Sipper Dep., at 251 & Ex. 344, at CAS2101, and four days later, Context Balance and BNM entered into a letter of intent. Id., at Ex. E (Bartle Dep., at 229-230) & Ex. 555, which provided that BNM would form a

new LLC entity and contribute the "Trademark Assets" to the new entity; that conditioned upon a valuation of the Trademark Assets of $20 million, "Context (through its designated affiliate, the 'Context Member')" would agree to fund up to $1.5 million for operations and "the costs of the TM Litigation" in return for a 50.1% membership interest in the LLC"; that Context would appoint the majority of the new LLC's Board of Managers; that the Context Member could abandon or discontinue the TM Litigation upon 30 days' notice to BNM; and that upon resolution of the TM Litigation, the LLC would distribute its net capital first to creditors, then to repay the Context Member, next to repay BNM up to $900,000, then to split the rest according to their respective ownership interests. Id.

TCCC has also presented evidence that on July 1, 2008, Belgam notified BNM that "our group will be investing through an entity named High Voltage Beverage Acquisition." Id., Ex. K (Toepke Dep., at 197-198) & Ex. 599. That day, High Voltage Acquisition GP, LLC was formed. Id., Toepke Dep., at 205 & Ex. 603, at HVB32870-71. Further, TCCC has presented evidence that on June 6, 2008, BNM formed a new LLC—High Voltage Beverages, LLC ("HVB"). Id., Toepke Dep., at 205 & Ex. 603. Also, TCCC's proffer provides that on July 30, 2008, BNM

contributed its assets to HVB via a Contribution Agreement. Id., Toepke Dep., at 207 & Ex. 604. That same day, BNM and HVA entered into a Limited Liability Company Agreement for HVB ("the LLC Agreement"), id., Toepke Dep., at 205 & Ex. 603, which provides for two members—BNM and HVA. HVB maintains a separate Capital Account for each member. See LLC Agreement, at § 2.3. BNM's "Initial Capital Contribution" included the assets contributed by the Contribution Agreement. Id., at HVB32873. HVA's "Initial Capital Contribution" was $1,500,000.00, which was about the same as the first eighteen-month operating budget for the business. Id., at HVB32872-73. Only HVA is obligated to make "Capital Contributions" to fund the "TM Litigation." Id., LLC Agreement, at § 2.2(b). HVA can terminate its obligation to make additional capital contributions, can cause HVB to abandon the trademark litigation, and can elect to dissolve HVB "following a Litigation Termination." Id., LLC Agreement, at §§ 2.2(c), 13.1(d) & HVB32879. After formation of such special purpose entity, HVB filed this lawsuit less than two weeks later on August 12, 2008.

TCCC has, therefore, presented sufficient evidence upon which a jury could find that HVB does not own any interest in the claim distinct from what it acquired from the "maintained party," BNM. From such evidence, TCCC could argue that HVB was contrived to subsume and control BNM for purposes of promoting this

-40-

litigation, all in return for a portion of the potential proceeds. Finally, even HVB admits that the claim it asserts against TCCC ripened no later than April 17, 2007, long before it came into existence, and seeks damages predating such formation. TCCC has, therefore, presented evidence that HVB is a stranger who bargained with BNM to divide the proceeds of this lawsuit between them, with HVB carrying the expenses of the suit.

### b.    Stirring Up Strife

Champerty exists only where the interference is "for the purpose of stirring up strife and continuing litigation." <u>Wright v. Commercial Union Ins. Co.</u>, 305 S.E.2d 190, 192 (N.C.App. 1983)(citation and corresponding quotation marks omitted). In order to show that it was stirring up strife, HVB contends that TCCC must present evidence of HVB's "assertion of a claim that the true holder had no intention of asserting." Such requirement is not, however, supported by current North Carolina law, and relies on a decision of the North Carolina Supreme Court that predates its decision in <u>Smith v. Hartsell</u>, <u>supra</u>, by more than 80 years, <u>Nichols v. Bunting</u>, 10 N.C. 86 (1824), and <u>Oliver v. Bynum</u>, 592 S.E.2d 707 (N.C. Ct. App. 2004), neither of which expresses such a requirement.

Instead, the meaning of "stirring up strife and continuing litigation" was recently addressed be the North Carolina Court of Appeals which involved third-party

litigation funding, <u>Odell v. Legal Bucks, LLC</u>, <u>supra</u>.   In <u>Odell</u>, the appellate court found that even though Legal Bucks advanced money to borrowers to be repaid out of the proceeds of litigation, there was no champerty because the agreement gave Legal Bucks no control, input, influence, right, or involvement in Odell's claim, and Legal Bucks did not influence Odell's decisions regarding her claim. <u>Id.</u>, at 775. Thus, North Carolina courts appear to look to whether the alleged champertor exercised "control over the claim" as the key to determining whether such involvement was "for the purpose of stirring up strife and continuing litigation." <u>Id.</u>

As detailed above, the agreement entered into by the members of HVB clearly provides evidence "control over the claim" has been vested in the alleged champertor. HVA, which appears to be the incarnation of the funders of the litigation, retains majority control over HVB, and can terminate its obligation to make additional capital contributions, can cause HVB to abandon the trademark litigation, and can elect to dissolve HVB "following a Litigation Termination." <u>Id.</u>, LLC Agreement, at  §§ 2.2(c), 13.1(d) & HVB32879.

TCCC has presented evidence sufficient to show a genuine issue of material fact on whether the alleged champertor provided funding "for the purpose of stirring up strife and continuing litigation."   The undersigned will recommend that summary judgment be denied on this contention as genuine issues of material fact remain for

-42-

trial.

### c.    Standing

Next, HVB contends that TCCC lacks standing to bring a counterclaim for champerty and maintenance.   The district court has already dealt with such issue earlier in this action, holding as follows:

> Plaintiff makes two additional arguments which carry little persuasive force with the Court. First, Plaintiff contends that Defendant does not have standing to assert a claim for champerty or maintenance because it was "a stranger to any alleged transaction between BNM and HVB." (Doc. 151, 22.) Plaintiff's argument simply misapprehends the law. To have standing, Defendant need only suffer injury from Plaintiff's champerty—nothing more. *See Oliver v. Bynum*, 592 S.E.2d 707, 711 (N.C. App. 2004).
>
> Second, Plaintiff argues that Defendant's counterclaims should be dismissed because Defendant "asserts its claims solely against HVB, the holder of the trademark." (Doc. 151, 10.) In other words, HVB could not have committed champerty by funding its own litigation. This argument ignores Defendant's claim that HVB is a shell company for Plaintiff's champerty. In this vein, Defendant identifies HVA—the financing arm of HVB—as the intermeddling financier; and BNM—the assignor and original owner of the trademark—as the party with a legitimate legal interest in the trademark's infringement. (Doc. 94-1, 24.) If additional parties must be joined pursuant to Rules 19 or 20 of the Federal Rules of Civil Procedure, then that defect can be cured by motion.

Order of Hon. Graham C. Mullen, United States District Judge (#188), at f.n.3.  Such constitutes law of the case.   Since that Order, TCCC has come forward with substantial evidence that HVB is a shell corporation, whose membership consists of the alleged champertor, HVA (which appears to be Context Balance) and BNM,

-43-

whose claim is being funded.

Finding that such request for summary judgment is foreclosed by law of the case, and that TCCC has standing to sue, the undersigned will recommend that this motion for summary judgment be denied.

### d. Damages

HVB, finally, contends that summary judgment should be granted because TCCC has no evidence that it has incurred damages from the alleged champerty. Damages are not, however, an element of champerty and maintenance in North Carolina. See Smith v. Hartsell, supra. Under North Carolina law, "[c]ertain torts require as an essential element to a cause of action that plaintiff incur actual damage." Hawkins v. Hawkins, 400 S.E.2d 472, 474-75 (N.C. App. 1991). "Other torts however, do not include actual damage as an essential element." Id. Champerty and maintenance, like most other intentional torts, does not include damages as an essential element. Once the elements of a cause of action are established, a "plaintiff is entitled to recover, as a matter of law, at least nominal damages, which in turn support an award of punitive damages." Hawkins v. Hawkins, 331 N.C. 743, 745 (1992) (quotation marks omitted). The undersigned will recommend that this motion for summary judgment be denied.

### e. Supplemental Response and Reply

-44-

The court has read the supplemental response and reply, and considered the supplemental exhibits. While such pleadings flush out some additional detail, they add little substance to the Rule 56 inquiry, which simply asks whether there are genuine issues of material fact for trial - - as shown above, there clearly are genuine issues of material fact that remain for the jury. In large part, the supplemental pleadings are more appropriately considered as (1) characterizations and arguments concerning the corporate structure of HVB and (2) arguments concerning what evidence should or should not be considered by a jury. The court has considered all properly submitted evidence in a light most favorable to the party resisting summary judgment and finds that sufficient evidence has been produced concerning the corporate structure of HVB to determine that the Counterclaim for Champerty and Maintenance must be resolved by a jury.

While such pleadings have been fully reviewed, the court finds that the thrust of such supplemental pleadings speaks to whether certain evidence should be considered by the jury at trial and, as such, are best considered by the trial court when filed *in limine*.

* * *

Inasmuch as this Memorandum and Recommendation is likely the last substantive involvement the undersigned will have with this matter as it transitions to

the district court's trial docket, the court wishes to commend the professionalism and collegiality of all counsel. While all counsel have aggressively pursued their client's interests herein, the court greatly appreciates the impact local counsel have clearly had in this matter as it allowed the parties to resolve disputes in a most productive manner as the case progressed.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that:

(1)    The Coca-Cola Company's Motion for Partial Summary Judgment (#197) be **GRANTED** as to plaintiff's claims that VAULT RED BLITZ and VAULT ZERO infringe its VOLT mark, and that such claims be **DISMISSED**, but that such motion be otherwise **DENIED**; and

(2)    plaintiff/counterclaim-defendant High Voltage Beverages, LLC's (hereinafter "HVB"), counterclaim-defendants Brand Name Management, Inc.'s (hereinafter "BNM") and Owen Ryan's (hereinafter "Mr. Ryan") Motion for Partial Summary Judgment (#199) be **GRANTED** as to defendant's Affirmative Defense of Acquiescence, and that such affirmative defense be **DISMISSED**, but that such motion be otherwise **DENIED.**

-46-

### Time for Objections

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

Signed: December 16, 2010

Dennis L. Howell
United States Magistrate Judge

-47-